UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JACOB PETERSON,

        Plaintiff,

   v.

KILOLO KIJAKAZI, Acting Commissioner of
Social Security Administration,

        Defendant.

Case No. 20-cv-1139-bhl

# DECISION AND ORDER

Plaintiff Jacob Peterson seeks a summary judgment order reversing and remanding the Acting Commissioner of Social Security's decision denying his application for Child's Insurance and Supplemental Security Income (SSI) benefits under the Social Security Act. For the reasons set forth below, Peterson's motion will be granted and the Acting Commissioner's decision reversed and remanded.

## PROCEDURAL BACKGROUND

Peterson filed for disability on January 31, 2017. (ECF No. 15 at 5.) His claim was denied initially and on reconsideration, so he sought a hearing before an administrative law judge (ALJ). (ECF No. 22 at 2.) That hearing occurred in May 2019. (*Id.*) In a decision dated July 31, 2019, the ALJ found Peterson "not disabled." (ECF No. 12-3 at 32.) The Appeals Council denied his request for review, and this action followed. (ECF No. 22 at 3.)

## FACTUAL BACKGROUND

At the time of his hearing before the ALJ, Peterson testified that he lived with his parents and younger brother. (ECF No. 12-3 at 46.) He also stated that he had dropped out of school after 11th grade and briefly held a few odd jobs in the interim. (*Id.* at 47-49.) Based on his testimony and the record evidence, the ALJ found that Peterson had the following severe impairments: degenerative disc disorder, a depressive disorder, an anxiety disorder, and attention deficit hyperactivity disorder. (*Id.* at 22.)

# LEGAL STANDARD

The Commissioner's final decision on the denial of benefits will be upheld "if the ALJ applied the correct legal standards and supported his decision with substantial evidence." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 42 U.S.C. §405(g)). Substantial evidence is not conclusive evidence; it is merely "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). The Supreme Court has instructed that "the threshold for such evidentiary sufficiency is not high." *Id.* In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (citation omitted).

In reviewing the entire record, this Court "does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Judicial review is limited to the rationales offered by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)).

# ANALYSIS

Peterson argues for remand because: (1) the ALJ improperly discounted the opinion of Dr. Sandra King; and (2) the ALJ failed to ensure that the vocational expert's (VE) job-number estimates were the product of a reliable method. While Peterson's first argument fails, his second challenge identifies reversible error. Because the record shows problems with the ALJ's handling of the VE's job-number estimates, the Acting Commissioner's decision will be reversed and remanded for further proceedings consistent with this order.

## I. The ALJ Properly Explained His Reasons for Finding Dr. King's Opinion Only Partially Persuasive.

Dr. Sandra King performed a psychological consultative exam on Peterson on March 27, 2017. (ECF No. 15 at 18.) She diagnosed autism spectrum disorder, attention-deficit/hyperactivity disorder, persistent depressive disorder, and generalized anxiety disorder. (ECF No. 12-8 at 44.) She also anticipated Peterson would have "mild difficulties remembering and carrying out instructions," "moderate difficulties in responding appropriately to supervisors and co-workers due to anxiety/Autism characteristics," a moderate impairment to his ability to maintain concentration and attention, and "moderate to severe difficulties withstanding routine work stress and adapting to change." (*Id.*) The ALJ found Dr. King's opinion "partially persuasive." (ECF

No. 12-3 at 28.) He credited her assessment of attention deficit hyperactivity disorder, depressive disorder, and generalized anxiety disorder but discredited her opinions regarding autism and work capacity as inconsistent with the record. (*Id.*)

An ALJ is not required to give the same weight to all medical opinions of record. Indeed, he has a "duty to resolve" conflicts of medical evidence. *Richardson v. Perales*, 402 U.S. 389, 399 (1971). Thus, "[w]hen treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). But substantial evidence will not support the ALJ's decision if he "cherry-pick[s] facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Even if he ultimately rejects it, the ALJ must at least discuss contradictory evidence. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

Peterson argues that the ALJ engaged in improper cherry picking, ignoring the objective evidence that supported Dr. King's opinion in order to make that opinion appear more extreme and disconnected from the record. He identifies a series of observations that he claims are conspicuously absent from the ALJ's decision, including that he cannot keep a job because he is unable to maintain expected production rates, cannot cook on a stove because he forgets to turn the burner off, is withdrawn and isolated, is able to concentrate to read a book for only a little while, has an impaired recent memory, and has a weak fund of knowledge. (ECF No. 28 at 14-15.) To Peterson's mind, these facts support Dr. King's opinion, and failure to discuss them constitutes impermissible "cherry-picking." But the ALJ did discuss them. In fact, even a cursory review reveals that the ALJ mentioned nearly every piece of allegedly absent evidence, sometimes word-for-word, in the portion of the decision dedicated to analyzing Dr. King's opinion. (*See* ECF No. 12-3 at 27-28.) Afterward, he credited some of Dr. King's opinion, but rejected other parts because they relied heavily on subjective reports from Peterson and his mother and ran counter to the overall record. (*Id.* at 28.)

This is not "cherry-picking." The ALJ discussed the relevant evidence, explained how he weighed it, and reached a decision. He noted that much of Dr. King's opinion turned on subjective reporting, and "[a]n ALJ may give less weight to an opinion that appears to rely heavily on the claimant's subjective complaints, even if the source of that opinion had examined the claimant." *Givens v. Colvin*, 551 F. App'x 855, 861 (7th Cir. 2013) (citing 20 C.F.R. §404.1527(c)(3) (other

citations omitted). He also highlighted that no other doctor had diagnosed an autism spectrum disorder, Dr. King's own findings did not support such a diagnosis, and suspiciously, Peterson had previously requested an autism evaluation from his primary care physician because a "lawyer told him if he was diagnosed with autism that he could get long-term disability." (ECF No. 12-8 at 100.) Moreover, the ALJ demonstrated that Peterson self-assessed more modest limitations than Dr. King in many respects. (ECF No. 12-3 at 28.) These are all good reasons for finding Dr. King's opinion only partially persuasive. *See Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) (holding that an ALJ's evaluation of conflicting evidence will survive review so long as it is rationally supported).

Peterson also takes issue with the ALJ's conclusion that "his inability to maintain employment is not due to mental difficulties[,] handling work stress[,] or productive quotas" but rather the fact that, as his primary care physician reported, "he is 'incredibly non motivated to do anything.'" (ECF No. 12-3 at 28) (quoting ECF No. 12-8 at 85.) He argues that this analysis uses a symptom (lack of motivation) of his depressive disorder to undermine limitations assessed, in part, because of that disorder. His point is well-taken. Someone with depression may appear lethargic, but lethargy as a symptom of a disease is distinct from laziness as an inherent vice. That said, the ALJ's misstep here is, at most, harmless error. "No principle of administrative law or common sense requires [courts] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). The ALJ supplied many reasons to reject Dr. King's uniquely intense work limitations. The fact that one of those turned out to be erroneous would not warrant a different result on remand. Therefore, any remand on this issue would be "a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

**II.     The ALJ Failed to Ensure the Reliability of the Vocational Expert's Testimony.**

When a claimant's severe impairments do not presumptively establish a disability but nevertheless preclude the claimant from performing past relevant work, an ALJ turns to a VE to determine whether there exists in the national economy a significant number of jobs that the claimant can perform. 20 C.F.R. § 404.1512. The VE is not required to perform a literal headcount of jobs in existence; she must only advance a reasonable approximation. *See Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018). That said, when a claimant calls into question the reliability of the VE's conclusions, an ALJ "must require the VE to offer a reasoned and principled explanation"

in support. *Id.* at 970. In other words, "the substantial evidence standard requires the ALJ to ensure that the [VE's] approximation is the product of a reliable method." *Id.* at 968. And this bar is cleared when the methodology "is based on 'well-accepted' sources and the [VE] explains her methodology 'cogently and thoroughly.'" *Ruenger v. Kijakazi*, 23 F.4th 760, 763 (7th Cir. 2022) (quoting *Biestek*, 139 S. Ct. at 1155).

In this case, the ALJ determined that while Peterson was not presumptively disabled, he could not perform any past relevant work, and thus sought a VE's appraisal of what jobs, if any, Peterson could work based on his assessed residual functional capacity (RFC). (ECF No. 12-3 at 62-67.) After considering hypotheticals that incorporated Peterson's RFC, the VE identified a number of jobs—like kitchen helper, assembler, and packager—that Peterson could perform and that existed in significant numbers in the national economy. (*Id.* at 64-65.) Given the numerous employment opportunities available to him, the ALJ found Peterson "not disabled."

But Peterson argues that the ALJ abdicated his duty to elicit testimony to ensure that the VE's job-number estimate was the product of a reliable method. *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). Reviewing a VE's job-number estimate is a particularly frustrating task, complicated by the fact that it often involves translating data through at least three different sources. *See e.g., Chavez*, 895 F.3d at 965-66. Most VEs begin with the Dictionary of Occupational Titles (DOT), which provides job titles but not employment estimates and has not been updated in three decades, meaning many of its listed "jobs have changed[,] and some have disappeared." *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014). To approximate the number of jobs available for each DOT title, the VE in this case (as is customary) turned to the Department of Labor's Occupational Employment Survey (OES). *See Ruenger*, 23 F.4th at 762. The trouble is, the OES defines jobs according to Standard Occupational Classification (SOC) codes, and most SOC codes include several DOT titles. *Id.* "This creates a matching problem: vocational experts can identify the number of jobs in the larger SOC grouping but cannot identify how those jobs are distributed among individual DOT job titles within that grouping." *Id.* To bridge the gap, VEs often look to the Occupational Employment Quarterly (OEQ), which estimates the number of jobs available in the national economy for each DOT title. *Id.* OEQ does employ the much-maligned "equal distribution method" in its calculations. *Id.* But although the Seventh Circuit has repeatedly lambasted that method as intellectually bereft, *see, e.g., Alaura v. Colvin*, 797 F.3d 503, 507-08 (7th Cir. 2015); *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015); *Browning*, 766 F.3d at 709,

use of equal distribution will not result in reversible error unless the VE fails to justify it. *See Ruenger*, 23 F.4th at 764.

The primary confusion in this case results from the ALJ, VE, and Peterson's attorney talking past each other. When asked, given Peterson's RFC, if there were any jobs in the national economy that he could work, the VE replied: "Yes. Examples would be kitchen helper. DOT number [3]18.687-018. 492,000. . . . Assembly. DOT 726.687-022. . . . 230,000 people do that. Packaging. . . . DOT 753.687-038. . . . 316,000 people do that." (ECF No. 12-3 at 64-65.) This puzzled Peterson's attorney because the DOT title "kitchen helper" is one of three jobs that fall within SOC code 35-9021 "Dishwashers." And, according to the OES, in 2018, that SOC code accounted for only 504,770 jobs across the entire country. Thus, if one employs the equal distribution method, and assumes that each of the three DOT titles within that SOC code has an equal share of those 504,770 jobs, the VE should have found only roughly 168,257 people (not 492,000) employed as kitchen helpers. And the VE testified that she did not alter the numbers she found in the OEQ, (*Id.* at 68), leaving no obvious explanation for how she determined that "kitchen helper" actually comprised over 97% of the code 35-9021 jobs available.

But though inartful and given with perhaps needless haste, the VE's testimony on cross-examination does illustrate how she managed to arrive at such a facially dubious figure. According to the VE, the DOT number she offered was only meant as an example of one job in a "category" that contained 492,000 positions. (*Id.*) She unhelpfully dubbed that "category" "kitchen helper," but she was not using those words in the same manner as they are used in DOT title 318.687-018. Thus, the VE's "kitchen helper" category encompassed more than just the DOT title 318.687-018 she used as a representative example. She grouped together a variety of DOT titles (found under different SOC codes) that she believed fell within the ambit of "kitchen helper" to form a new category comprising 492,000 total jobs, of which DOT tile 318.687-018 accounted for only 168,257. Essentially, (and to compound the confusion) the VE created her own unique job classification system. This is more easily understood in the context of the "Assembly" category. There, the VE referenced DOT title 726.687-022 "Encapsulator." But she explained that she "didn't use an SOC number," for this (*id.*), meaning she did not rely on DOT titles within a single SOC code to arrive at her estimate. Instead, she "just used assembler, light and unskilled and gave . . . the DOT example." (*Id.*) Once again, then, the VE's testimony did not mean that there were 230,000 "Encapsulators" in the national economy; it meant that "Encapsulator" was one DOT title

among many comprising a category that the VE called "Assembly," which accounted for 230,000 jobs that someone with Peterson's RFC could perform.

This bespoke classification system makes it next to impossible for the Court to plug in numbers and double-check the VE's math. Of course, the substantial-evidence standard is a low bar, and it is not the Court's job to parent the VE's math homework. Affirmance is required even if "the VE's description did not reveal the precise mechanics and statistical model involved" as long as the testimony "constitutes a 'reasoned and principled explanation.'" *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020). The VE need not proffer a mathematical formula. *See LaPierre-Poff v. Saul*, No. 20-c-819, 2021 WL 1171692, *5 (E.D. Wis. March 29, 2021). Nor is there any categorial rule requiring a VE to turn over her underlying data. *See Biestek*, 139 S. Ct. at 1156-57. Thus, the VE's testimony was not, in a vacuum, unreliable.

The problem is that the ALJ did not hold up his end of the bargain. If a claimant objects to the reliability of the VE's testimony, the ALJ has an affirmative duty to interject and inquire into the methodology employed. *See Donahue*, 279 F.3d at 446. The VE can then "offer an informed view on the reasonableness of [her] estimates" by "draw[ing] on [her] past experience with the equal distribution method, knowledge of national or local job markets, or practical learning from assisting people with locating jobs through the region." *Chavez*, 895 F.3d at 969.

At the close of cross-examination, Peterson's attorney objected to the VE's testimony because it relied on the equal distribution method. (ECF No. 12-3 at 69.) Rather than give the VE an opportunity to justify her reliance on that method, the ALJ instigated an argument and refused to entertain further discussion unless counsel, himself, proposed superior job-number estimates. (*Id.*) This was an error. At step five, the Acting Commissioner has the burden to demonstrate "that the claimant is capable of performing work in the national economy." *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). Counsel, therefore, did not need to prove himself a worthier vocational expert in order to lodge an objection. Even worse, the ALJ went on to state that the VE's method "may not be perfect, it may not be *accurate*[,] but counsel has not suggested any other method he can point to." (ECF No. 12-3 at 70) (emphasis added). Not only does this, again, improperly shift the Acting Commissioner's burden to the claimant, it also reveals alarmingly incurious accession to a methodology that the ALJ openly doubted.

Had the ALJ asked the VE *why* she trusted the OEQ's use of the equal distribution method, she might have affirmed her confidence in it, pointed out that many VE's rely on it, and drawn on

her past experience. Instead, the record is completely devoid of any testimony regarding the reliability of equal distribution. The only time the VE references her education and experience is in response to a question about how she considers "things like time off task and absenteeism" that the DOT does not address. (ECF No. 12-3 at 65.) And this is not harmless error. The Court cannot assume that the VE would have properly justified her use of equal distribution given the chance. VEs have not always done so. *See Chavez*, 895 F.3d at 969-70; *Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020) (reversing where the VE's explanation contained no "indicia of reliability"). On this record, the Court cannot say that the ALJ's decision rests on substantial support because he neglected his duty to probe the reliability of the VE's methodology. *See Brace*, 970 F.3d at 823 (7th Cir. 2020).

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's motion for summary judgment, ECF No. 15, is **GRANTED**. Pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision is reversed, and the case is remanded to the Acting Commissioner for further proceedings consistent with this opinion.

Dated at Milwaukee, Wisconsin on October 26, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge